1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                     FOR THE DISTRICT OF OREGON

10

11  GARY M. THEBO,                    )
                                      )    No. CV 08-3121-HU
12              Plaintiff,            )
                                      )
13        v.                          )
                                      )    OPINION AND
14  MICHAEL J. ASTRUE,                )       ORDER
    Commissioner, Social             )
15  Security Administration,         )
                                      )
16              Defendant.            )
    ─────────────────────────────────)
17
    Arthur W. Stevens III
18  Black, Chapman, Webber, Stevens, Petersen & Lundblade
    221 Stewart Avenue, Suite 209
19  Medford, Oregon 97501
         Attorney for plaintiff
20
    Kent Robinson
21  Acting United States Attorney
    District of Oregon
22  Adrian L. Brown
    Assistant United States Attorney
23  1000 S.W. Third Avenue, Suite 600
    Portland, Oregon 97204
24
    David J. Burdett
25  Special Assistant United States Attorney
    Office of the General Counsel
26  Social Security Administration
    701 Fifth Avenue, Suite 2900 M/S 901
27

28  OPINION AND ORDER Page 1

Seattle, Washington 98104
     Attorneys for defendant

HUBEL, Magistrate Judge:

     Gary Thebo brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for Disability Insurance benefits under Title II of the Social Security Act.

## Procedural Background

     Mr. Thebo filed an application for benefits on March 1, 2005. The application was denied initially and upon reconsideration. Mr. Thebo requested a hearing, which was held on August 7, 2007, before Administrative Law Judge (ALJ) Gary Elliott. On September 18, 2007, the ALJ issued a decision finding Mr. Thebo not disabled. The Appeals Council denied Mr. Thebo's request for review on September 18, 2008, making the ALJ's decision the Commissioner's final decision.

     Mr. Thebo was 35 years old at the time of the ALJ's decision, and has a college education. He has not engaged in substantial gainful activity since his alleged onset date, October 1999. His date last insured is December 31, 2004. Mr. Thebo alleges disability based on a combination of impairments, including degenerative disc disease of the lumbar spine, degenerative joint disease of the ankles, and post-traumatic stress disorder (PTSD).
///

OPINION AND ORDER Page 2

**Medical Evidence**

In February 1995, Mr. Thebo was diagnosed with mild obstructive ventilatory defect. Tr. 351. On February 5, 1997, Mr. Thebo applied to the Veterans Administration (VA) for service connected disability for the respiratory condition and a right fifth metacarpal fracture. He also requested that the VA consider new evidence of disabling conditions of the right and left knees, back and digestive system, as well as other conditions including contact dermatitis, paralysis, chronic left hand disability, chronic headaches, chronic fatigue syndrome, and hypertension. Tr. 72. On January 13, 1997, the VA awarded Mr. Thebo 10% disability for the respiratory condition. Id. The VA denied Mr. Thebo's other claims. As of January 13, 1997, Mr. Thebo had disability ratings of 10% from tinnitus, which had been awarded on January 13, 1995, and 10% for exertional asthma and chronic cough. Tr. 75.

On July 21, 1999, Mr. Thebo requested medical treatment for chronic joint aches. Tr. 454. His chart note recorded that in 1997, he had been referred to a rheumatology clinic for these complaints, but had not shown up for appointments and had been terminated as a patient. Tr. 454, 455-57.

In 2000, Mr. Thebo was seen at VA clinics complaining of shortness of breath, chest constriction, sweating, exhaustion, coughing, headaches, tingling in his arms, hands and fingers, and a decrease in peripheral vision. See, e.g., tr. 386, 401, 407.

On February 25, 2000, he called the VA with complaints of pain in his chest upon deep breathing for the past two months and

OPINION AND ORDER Page 3

hemoptysis (coughing up blood) for the past four years. Tr. 452. On February 27, 2000, Mr. Thebo presented at the VA reporting hemoptysis for five years, saying the volume of blood had recently increased from six to 12 ounces per day.[1] Tr. 449. Mr. Thebo described the blood as "bright red," tr. 451, and also as "dark." Tr. 449. He reported shortness of breath and lightheadedness, not controlled with Azmacort and albuterol. Id. Mr. Thebo also complained of chronic chills and night sweats without fever, decreased energy, multiple joint aches with swelling, and diarrhea for the past three to four months. Id. He was seen by Joseph Sanchez, M.D. Dr. Sanchez's examination of Mr. Thebo was unremarkable; Dr. Sanchez noted that no hemoptysis was seen and that he "doubt[ed] massive hemoptysis." Tr. 450. X-rays of the chest in 1995 and 1996 had been normal. Tr. 342. On February 29, 2000, a CT scan of the chest was unremarkable except for enlargement of the main pulmonary artery. Tr. 376. However, on March 4, 2000, and April 4, 2002, pulmonary function testing indicated a severe ventilatory defect of mixed etiology. Tr. 480, 490. An echocardiogram on October 25, 2002, was normal. Tr. 468.

Between May 8 and 18, 2000, Mr. Thebo was given a whole body bone scan. Tr. 470. There was increased radiotracer uptake at the right ankle's insertion of the Achilles tendon and at the shoulders and sacroiliac joints, likely degenerative. Id. X-rays of the lumbosacral spine and sacroiliac joints showed normal vertebral body heights and alignment, mild disk space narrowing at L3-4 and

---

[1] Twelve ounces is 3/4 of a pint.

L4-5, and slight sclerosis attributed to mild degenerative disease. Tr. 474. Imaging of both feet showed some minimal degenerative changes and minimal spurring. Id. Images of both hands showed no evidence of erosive changes or periostitis to suggest an inflammatory arthropathy. Id. Previous MRIs of the cervical and thoracic spine, taken in June 1996, had been normal. Tr. 364, 365.

On May 16, 2000, Mr. Thebo was seen by Edwin Mante, M.D. for a neurological examination. Dr. Mante wrote that cranial nerves were normal, the motor system showed no weakness, atrophy or abnormal muscle tone, deep tendon reflexes were brisk and equal without Babinski's sign, sensory examination was normal, there were no signs of ataxia on a coordination test, and gait was normal. Tr. 416. Dr. Mante diagnosed depression and tension headache. Id.

On June 20, 2000, Mr. Thebo was examined by K.L. Casey, M.D., chief of neurology. Tr. 409. Vision testing was normal. Tr. 408. Musculoskeletal examination revealed "giveaway" weakness, with initial strength upon strong challenge followed by laxity. Id. Sensory examination was inconsistent, first showing loss of positional sense in the toes and vibrational sense in the lower extremities, and subsequently showing regained positional sense in the toes and vibrational sense throughout the lower extremities. Tr. 409. Dr. Casey's impression was muscular weakness and a sensory examination inconsistent with a physiologic lesion, without evidence of any neurologic disease. Id.

On July 17, 2000, Mr. Thebo was seen by Irene Young, M.D., for complaints of decreased breathing capacity and fatigue, intense

OPINION AND ORDER Page 5

headaches associated with coughing, passing out from violent coughing approximately once a week, incontinence, and multiple arthralgias and myalgias. Tr. 401. He described his muscles feeling like he "ran a marathon." Id. He also reported decreased and blurred vision. Id. His current medications included Naprosyn, Tylenol #3, and asthma inhalers. Id. Dr. Young noted that Mr. Thebo had been worked up for seizures by neurologists, with negative results. Id. Examination of his extremities revealed strength of 4/5 with "breakaway weakness noted in all muscles tested." Id.

An MRI of the brain and cervical spine on July 24, 2000, showed normal head and no cervical spinal or spinal canal abnormalities. Tr. 387, 461-62, 464.

On November 13, 2000, Mr. Thebo was again discharged from the rheumatology clinic for failure to keep scheduled appointments. Tr. 384.

On July 14, 2000, Mr. Thebo was seen for a psychological evaluation by Linas Bieliauskas, Ph.D. Tr. 382-83. Mr. Thebo reported that he had been exposed to biological weapons in December 1991 during the Gulf War, and suffered from asthma, coughing spells associated with fainting and incontinence, tinnitus, headaches, poor vision, frequent vomiting, osteoporosis, and osteoarthritis as a result of this exposure. Tr. 282. Mr. Thebo and his wife stated that the symptoms began immediately after the exposure and had become increasingly worse. Id. Mr. Thebo related that 13 of the 14 men in his unit exposed to the biological weapon were dead. Id.
///

OPINION AND ORDER Page 6

On February 12, 2001, Lynn Hall, Ph.D., wrote a letter to support Mr. Thebo's claim for service connected PTSD. Tr. 510-11. Dr. Hall wrote that she had met with Mr. Thebo on January 23, 2001, and that during the meeting he described a "constellation of symptoms characteristic of PTSD," related to "work he had to do as an MP at gruesome crime scenes and as a witness to the aftermath of atrocities and catastrophic epidemics ... in Bosnia, Egypt, Afghanistan, Rwanda and Kuwait." Id. The symptoms Mr. Thebo described included frequent flashbacks and nightmares, intrusive memories of his military traumas, lack of interest in activities, feelings of detachment and a sensation that things were "moving in slow motion," the belief that "death is just around the corner" for him, intense psychological distress when reminded of the trauma, outbursts of anger, especially when watching TV news about politics, difficulty falling and staying asleep, avoidance of thoughts, feelings, activities, places and people who reminded him of the traumas, social isolation, intense fear of being touched on the face, and survival guilt after attending a murder scene in which the victim was a friend. Id.

On April 9, 2002, Mr. Thebo was given a psychological evaluation by two psychiatrists, Kinh Phan, M.D., and Stan Golec, M.D., and a psychologist, Robert de Young, Ph.D., in connection with his application for service-connected disability for PTSD. Tr. 523-26. Doctors de Young and Golec wrote that Mr. Thebo reported enlisting in the Army in 1989 and receiving an honorable discharge in 1995. Tr. 526. Because Mr. Thebo did not bring copies of his

OPINION AND ORDER Page 7

military papers, his information about his time in the military could not be corroborated. Id. [2]

Mr. Thebo reported that he had been in the Military Police and the Protective Service Division, as well as being a combat life saver and trained in air assault. Id.[3] He said he served in the Gulf War, in Bosnia during the conflict, and "Somalia and/or Rwanda, although the [patient] was not completely certain which country at different points of the interview." Id. He reported experiencing many stressful events while he was in the military. He said he had participated as a test subject in a project called "Blast Over Pressure" in Albuquerque, New Mexico, a test of ear protectors that involved exposing Mr. Thebo and other soldiers to increasingly louder C-4 explosions from a few feet away. Mr. Thebo said he was removed from the project "when his body began to break down and he began to defecate blood." Tr. 526. Mr. Thebo reported two traumatic occurrences while he was stationed in Germany: cleaning up the body parts of a young girl who committed suicide by standing in front of a train, and later learning that the father of the girl's unborn child was someone he knew; and cleaning up two crime scenes which were related to the murder by decapitation of one of Mr. Thebo's friends. Id.

---

[2] Although Doctors Phan, Godec and deYoung had no documents corroborating Mr. Thebo's statements to them about his military service, Mr. Thebo's DD-214 (Discharge from Active Military Duty) is in the record before the court. Tr. 71.

[3] Mr. Thebo's DD-214 states that Mr. Thebo's primary specialty was military police for four years and three months, and that his military education was nine weeks of law enforcement training and two weeks of air assault school. Tr. 71.

Mr. Thebo reported that in Saudi Arabia, he was exposed to a radioactive substance while burying Scud missiles, to which he attributed blisters that appeared on his face, and that he had been told by a military doctor he had radiation burns on his lungs, but was later told by the VA that no such condition existed. Tr. 527. He said that in Bosnia, he was ordered to demolish a building with teenagers inside, killing them, and in either Rwanda or Somalia, he was ordered to first bury, then unbury, bodies after a massacre, with the victims' relatives standing nearby. Id. He said the flesh of the bodies had been eaten away by "Eboli." Id. [4]

Mr. Thebo reported unwanted thoughts, dreams of swimming in body parts, worries about "someone invading him," and seeing images of body parts in different colors. Id. He said he had difficulty sleeping and was irritable, having "punched every door in the house," and once throwing a knife into a wall. Tr. 527-28. He denied hitting anyone, but later in the interview said he was once violent toward a non-commissioned officer and told to see a psychiatrist. Tr. 528. He said he is hyper-vigilant about "whatever," and is sensitive to sounds. Id.

Dr. Phan wrote that Mr. Thebo was "inconsistent about the duration of" his symptoms, but said he had only noticed them to be a problem for the past two weeks to a month. Tr. 525.

---

[4] The DD-214 in the record states that Mr. Thebo served overseas for a total of two years, 10 months, and 27 days, but it does not reveal where he served overseas or his actual assignments there. Likewise, there is no evidence in the record before the court showing any medical treatment in the military or shortly thereafter for any of the conditions alleged to have been brought on by these assignments.

The examiners concluded,

> Mr. Thebo ... presents with very unusual description[s] of his role in the military and many unusual stressful events. While it is possible that he has experienced one or more events that were traumatic in nature, the way in which he relayed the above described events and the symptoms he reports to be experiencing is [sic] very internally inconsistent and not at all consistent with a diagnosis of PTSD. It appears that some of this inconsistency is due to voluntary distortion of the [patient's] circumstances, possibly for some secondary motivation. It also appears that the [patient] has some characterological problems that contribute to his difficulties.

Tr. 529. Dr. Phan wrote in an addendum that Mr. Thebo gave a "bizarre history of events without documentation," which appeared "more fictional than delusional." Tr. 523. He found no evidence of psychosis. His cognitive examination, particularly orientation, was "nonspecific and inconsistent." Id. In Dr. Phan's opinion, the examination suggested "possible malingering or conversion symptoms, rather than PTSD." Id.

The examiners' diagnoses were malingering and possible conversion disorder, with a provisional diagnosis of borderline personality disorder. Tr. 523, 529.

Between September 6, 2001, and April 29, 2002, Mr. Thebo was given numerous diagnostic tests, including a gastric emptying scan, x-rays of the lumbosacral spine, chest, and pelvis, and a three phase bone scan. Tr. 561. The gastric emptying scan was normal, with no evidence of gastroesophageal reflux. Tr. 561-62. The x-rays revealed mild degenerative disk disease of the lumbar spine, "minimally progressed" from the prior study, and the pelvis showed a benign bone island in the right proximal femur. Tr. 565. The bone scan indicated some soft tissue inflammation in the region of the

OPINION AND ORDER Page 10

Achilles tendon bilaterally, but there was no evidence of bone infection or inflammation. Tr. 565-66. X-rays showed normal cardiac and mediastinal silhouette, and no pulmonary nodules, focal air space disease, pulmonary edema, or pleural effusion. Tr. 564.

Mr. Thebo received another psychological assessment on October 23, 2002. Tr. 514. Mr. Thebo reported that he had been exposed to radiation as a result of having the depleted uranium from an artillery round "c[o]me back on him" in Bosnia. Id. The radiation had caused him to have osteoarthritis in the back and hand, as well as seizures in which his temperature fluctuated from 105° to 93°. Id.

With respect to his military duties, Mr. Thebo reported that he attended "every school they had in the military because a General liked me," including school for Rangers, Special Forces, and medics. Id.[5] He related that he had guarded several well-known generals and the Pope, with the Pope telling Mr. Thebo that "all the Serbs should be killed because they are not Catholic;" engaging in multiple classified missions too secret to appear in his military records; being directly involved in 12 combat missions when in Bosnia, including once being separated from his unit for six months, reported as dead, and eventually being rescued by a young Bosnian; and the "Blast Over Pressure" project. Id.

The examiner wrote that Mr. Thebo was a "very vague and poor historian," with "multiple minor discrepancies." Tr. 515. The examiner's diagnoses were the same as those found at the earlier

---

[5] See footnote 1.

assessment: Malingering or Conversion Disorder and Borderline Personality Disorder. Tr. 516.

On April 28, 2005, Frank Lahman, Ph.D., did a records review on behalf of the Commissioner, for the period between October 11, 1999 and December 31, 2004. Tr. 575. Dr. Lahman found no medically determinable mental impairment, writing that the "primary [diagnosis] was malingering." Tr. 575, 587. Scott Pritchard, D.O. and Mary Ann Westfall, M.D. did records reviews on behalf of the Commissioner for the same period. Their conclusions were that Mr. Thebo had degenerative disc disease of the lumbar spine and degenerative joint disease of the ankles, with minimal functional limitations noted. Tr. 590-92. They opined that these impairments, and Mr. Thebo's allegations of shortness of breath, exertional asthma, and joint aches, limited Mr. Thebo to light exertion. Tr. 597.

On April 4, 2006, Mr. Thebo was seen for an initial psychiatric assessment by psychiatric nurse practitioner Kevan Olson. Tr. 625. Mr. Olson observed that Mr. Thebo had a labile mood, rapid pressured speech, grandiosity, and delusions. Tr. 626. Mr. Thebo described his military history as including duty in Bosnia, Sarajevo, Panama, Desert Storm, and Rwanda. Tr. 628. He related disposing of bodies in Rwanda with the victims' children watching him "throw lye over their parents." Tr. 628. Although the children were starving, he was told not to feed them because military rations would make them die. Id. He also related that some of his friends died in the Pentagon on September 11, 2001. Id.

OPINION AND ORDER Page 12

Mr. Thebo described heightened hearing and seeing things not perceived by others, including alien spaceships. Tr. 629. He reported having been abducted by aliens since he was a child and said that when he was in the military, aliens abducted his entire company, although "most don't recall it." Id. He told the examiner aliens give off a sound that puts others to sleep, and that the military started using the sounds to make people crawl around. Id. He stated that the military "took something out of my back," and used the sound to "make you so you can't move." Id.

On September 14, 2006, Mr. Thebo was seen for a recurrent rash, which he attributed to Sarin exposure in the military while guarding Scud missiles. Tr. 622. He was diagnosed with follicular hyperkeratosis. Tr. 622-23.

### Hearing Testimony

Mr. Thebo testified at the hearing that for the previous five years he hadn't "been able to write hardly anything other than my signature," because of swelling in his hands "due to blast-over pressure where I sat on a blast pad and it [sic] blew C-4 up next to me." Tr. 838. He said that although he used to be good at math, he was now unable to do the "normal math that I used to do" because of his medications, PTSD and "emotional ups and downs." Id. Mr. Thebo said his memory was not "as good as it used to be," but that the reason he was unable to work was that he was

> emotionally up and down and with the medications that I'm on,
> I'm ... tired all the time and with the pain in my back and in
> my joints and it's--I would love to go get a job someplace,
> but even when I was trying to go to school during some of that
> time and I went to an interview for a job and because of the
> fact that I was going through the VA, they wanted to give me

OPINION AND ORDER Page 13

a physical and they gave me a physical and they said that I couldn't do the job that they had. There was no way that I could do it.

Tr. 840. Mr. Thebo described himself as an "emotional basket case." Id.

In response to a question about his PTSD from his attorney, Mr. Thebo testified that he had been in Rwanda burying bodies and putting lime on them to hasten decomposition. Afterwards, however, he was ordered to dig the bodies up and burn them. Tr. 841. The whole time the bodies were being disinterred, "their kids were watching, because for some reason it was mostly adults that got sick." Tr. 841-42. Asked about other traumatic assignments, Mr. Thebo said he was on a security detail guarding United States and foreign dignitaries, when

we got fired on by RPGs and they blew up the vehicle that I was in, but I was on top so I rolled off the top of the vehicle pulling the pin, watched my buddies basically get turned into mush in the vehicle.

Tr. 842. In addition, Mr. Thebo said he had been exposed to toxic chemicals when he fired a surface to air ballistic round. Tr. 842. Mr. Thebo testified that he was getting 100% disability from the VA for his conditions.[6] Asked to rate his impairments in order of severity, he testified that the worst was the PTSD, then the "lung problems," and then "my joint pain." Tr. 846. Mr. Thebo related that if he fails to take his medications at the precise times

---

[6] There is no corroboration in the record that Mr. Thebo is on 100% disability from the VA. The VA records before the court indicate that Mr. Thebo had a disability rating from the VA of 10% for tinnitus and 10% for a bronchial condition as of January 1997, tr. 75, and ratings of 30% in October 2002, and 40% in May 2006 for "bronchial condition." Tr. 535, 625.

OPINION AND ORDER Page 14

prescribed, he has "outbursts where like my wife's had to chase me down the street." Tr. 844. Mr. Thebo said his wife supports the family financially and "takes care of everything," including telling him what to wear, leaving chore lists out for the kids, managing the house, and keeping in touch with everyone in the family when she is at work. Tr. 846-47.

On a bad day, Mr. Thebo said, he can't do anything but sleep, because "it's like breathing through a wall of Vaseline." Tr. 847. He said his doctors have attributed his joint pain to different things, including "scarring from the bombs that, that--I sat on a platform when I first went in the Military where they blew up C-4 next to me," causing his pants legs to leave red cuts on his legs. Tr. 848. Another doctor has told him it was "due to the radiation I was exposed to," which caused "a white, like chalky substance that builds up in your joints that, you know, because it like coagulates there..." Tr. 848. Mr. Thebo said he is unable to use his fingers, to the point that his wife has to button his pants and shirt. Tr. 849.

Mr. Thebo's wife, Michelle, testified. Tr. 852. She said that on a day to day basis she has to give Mr. Thebo lists because he "gets sidetracked or he's tired and he doesn't ... care to do it." Tr. 853. She testified that when she gets home from work she cleans the house and gets the kids "back in line," as well as paying the bills because Mr. Thebo can't "handle the stress or deal with that kind of thing." Tr. 853-54. She said he "doesn't like to go out and deal with anything," and gets upset very easily, "especially when

OPINION AND ORDER Page 15

I request things of him." Tr. 854. She said her husband was unable to sleep and was "always out, outside walking around the house," because he is hypervigilant and paranoid. Id. He does not trust anyone and as a result, "we don't really get along with our neighbors very well." Id. Mrs. Thebo said her husband became "irrationally angry," and didn't "sleep at night because he's walking and patrolling, essentially," and then slept during the day so that their three children "have to watch themselves much of the time." Tr. 855.

The ALJ called a vocational expert (VE), Lynn Jones. Tr. 859. The ALJ asked Ms. Jones to consider a hypothetical individual of Mr. Thebo's age and education, with his past relevant work, able to do work at the light exertional level, but with limited climbing, stooping, crouching and crawling. Tr. 860. The VE testified that such an individual could not perform Mr. Thebo's past relevant work, but could do light, unskilled work as a ticketer, table worker, and assembler of small products. Tr. 860-61. The ALJ added the limitations of being limited to simple, routine tasks and instructions, with no public contact, only occasional co-worker contact, and no teamwork. Tr. 861. The VE opined that such a person could still perform the table worker job, and could also work as a garment sorter and a hand stuffer. Tr. 861.

### Standard

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111,

OPINION AND ORDER Page 16

1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant must establish that the current disability began on or before the date last insured. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1995); Flaten v. Secretary, 44 F.3d 1453, 1458 (9th Cir. 1995).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

OPINION AND ORDER Page 17

laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her

OPINION AND ORDER Page 18

age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## ALJ's Decision

At step two, the ALJ found that Mr. Thebo had the severe impairments of degenerative disc disease of the lumbar spine and degenerative joint disease of the ankles. Tr. 23. He found Mr. Thebo's claimed impairment of PTSD was a "questionable diagnosis that included credibility issues from his treating sources at the VA," and concluded, on the basis of the evaluations of Doctors Phan, Golec and de Young, and the evaluation of reviewing psychologist Dr. Lahman, that Mr. Thebo had not established, through objective medical evidence, that his ability to perform work-related functions was affected by a severe mental impairment. Tr. 23-24.

At step three, the ALJ found that Mr. Thebo did not have an

OPINION AND ORDER Page 19

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1; the ALJ stated that he had given particular consideration to Listing 1.00 (musculoskeletal system) in Appendix 1. Tr. 24.

The ALJ acknowledged that ordinarily, great weight is given to the VA's determination of disability unless valid reasons exist for departing from the VA's findings, citing <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076 (9th Cir. 2002). The ALJ's only stated reason for not giving great weight to the VA's determination was that it was based on a standard of disability different from that for Social Security benefits. Tr. 25. The ALJ also noted, however, that the only documentation in the record indicating disability of more than 20% is dated 2006 and based on Mr. Thebo's bronchial condition. <u>Id.</u> The ALJ concluded that because the 2006 document was dated "well after the claimant's date last insured," "any increased rating in VA disability thereafter would not affect the decision rendered in this case." <u>Id.</u>

The ALJ found Mr. Thebo's testimony about emotional instability and PTSD not credible, based on the opinions of Doctors Phan, de Young, and Golec, that Mr. Thebo's reported symptoms were internally inconsistent, that the inconsistencies were voluntary distortions, and that the symptoms were not consistent with a diagnosis of PTSD. Tr. 24. The ALJ rejected Mr. Thebo's testimony at the hearing about deficient memory and concentration on the ground that VA records as late as October 2006 indicated that Mr.

OPINION AND ORDER Page 20

Thebo had told treating physician Neal Thompson, M.D., that he was going to research a medication on the internet before deciding whether to take it. Tr. 26, citing tr. 631.

The ALJ's credibility findings were also based on inconsistencies between Mr. Thebo's testimony at the hearing and his self reported activities. Tr. 26. In a Function Report completed in May 2005, soon after his date last insured, Mr. Thebo reported that he had the ability to care for his three children while his wife worked; perform household chores including laundry and meal preparation; wash his car; grocery shop two to three times a week; attend church and his children's school; watch movies almost daily; play fetch with his dog; and walk half a mile before requiring rest. Tr. 26, citing tr. 102-109.

The ALJ noted that MRIs and bone scans of Mr. Thebo's cervical spine and hands indicated no arthritic changes, and the degenerative changes seen in the right ankle, shoulders and sacroiliac joints were characterized as "minimal." Tr. 25. Moreover, the ALJ found, the neurological evaluation in May 2000 by Dr. Mante indicated full motor strength in all extremities with no signs of weakness, atrophy, or abnormal muscle tone. The ALJ also referred to evidence that Mr. Thebo had been terminated from the rheumatology clinic for noncompliance. Tr. 25.

The ALJ concluded that Mr. Thebo was unable to return to his past work as a materials handler, which was at the heavy exertion level, but that he was able to lift 20 pounds occasionally and 10 pounds frequently; stand and walk six hours out of an eight hour

OPINION AND ORDER Page 21

day; and sit six hours out of an eight hour day. Mr. Thebo was also limited to occasional climbing, stooping, and crawling. On the basis of these findings, the ALJ concluded that Mr. Thebo had the residual functional capacity to perform the light exertion jobs identified by the VE at the hearing.

**Discussion**

Mr. Thebo asserts that the ALJ erred in not finding him disabled on the basis of all his impairments in combination; rejecting the PTSD diagnosis of Dr. Hall; rejecting Mr. Thebo's subjective symptom testimony; rejecting the testimony of Mr. Thebo's wife and mother; failing to give proper weight to the decision of the Department of Veterans' Affairs granting Mr. Thebo 100% disability for his PTSD, respiratory condition, and tinnitus; and presenting the VE with an incomplete hypothetical.

1. <u>ALJ's failure to find that Mr. Thebo was disabled by the combination of his alleged impairments</u>

Mr. Thebo asserts in his brief that he is disabled due to degenerative disk disease of the lumbar spine and degenerative joint disease of the ankles; asthma/lung disorder; chronic joint pain/fibromyalgia; fatigue; chronic skin disorder; abnormal liver chemistry; early onset rheumatoid arthritis; headaches; gastrointestinal conditions; heart problems; hypertension; and mental disorders including anxiety, PTSD, depression and possible bipolar disorder, delusions, paranoia, and pain.

The record contains no diagnoses of fibromyalgia, a chronic skin disorder, rheumatoid arthritis, gastrointestinal conditions, or heart problems, and no objective evidence that these conditions

OPINION AND ORDER Page 22

exist. The ALJ found Mr. Thebo's symptom testimony about headaches, fatigue and pain not credible; as discussed below, there is substantial evidence in the record as a whole to support this finding. In view of the conclusions by two psychiatrists and a psychologist that Mr. Thebo showed no evidence of psychosis, and that his reported mental symptoms were inconsistent with one another, inconsistent with PTSD, and possible voluntary distortions, there is substantial evidence to support the ALJ's finding that Mr. Thebo did not suffer from a severe mental impairment.

    2.   <u>ALJ's credibility findings</u>

    Mr. Thebo contends that the ALJ erred in finding not credible 1) his testimony that for the last five years he has been unable to write anything other than his signature because of swelling in his hands; 2) his testimony that he was "emotionally up and down," tired, and suffering from joint pain; 3) his descriptions of the traumatic episodes in Rwanda and Bosnia; and 4) his statement that the VA regarded him as 100% disabled.[7]

    A claimant's testimony about pain may be disregarded if it is unsupported by medical evidence which supports the *existence* of such pain, although the claimant need not submit medical evidence which supports the *degree* of pain. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 347 (9th Cir. 1991)(en banc). The Commissioner's reasons for

---

    [7] Mr. Thebo acknowledges that the record does not contain documentation of his current VA disability status, and that the only documentation of VA disability in the record is the rating decision in February 1997 of 20% disability.

rejecting the claimant's subjective testimony must be "clear and convincing." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid. Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007).

The only time the "clear and convincing" standard does not apply is when there is affirmative evidence suggesting that the claimant is malingering. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006); Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008). However, the ALJ need not make a specific finding of malingering. Carmickle 533 F.3d at 1160.

There is evidence of malingering in the mental evaluations given to Mr. Thebo, as well as two physical examinations in which the physician noted breakaway weakness and inconsistent sensory testing. However, even if there were no such evidence, the ALJ's credibility findings are clear and convincing because they are based on the absence of clinical evidence substantiating Mr. Thebo's claimed medical conditions, inconsistent statements, daily activities inconsistent with the alleged symptoms, and medical noncompliance.

The ALJ found that Mr. Thebo's testimony was undermined by his own statements in May 2005, shortly after his date last insured,

OPINION AND ORDER Page 24

that he was able to care for his children, do laundry, prepare
meals, wash his car, grocery shop, attend church and his children's
school, play fetch with his dog, and walk half a mile before
needing rest. These statements directly contradict Mr. Thebo's
testimony about inability to use his hands, fatigue, and joint
pain. Moreover, as the ALJ pointed out, Mr. Thebo's Pain
Questionnaire, filled out at approximately the same time as the
Function Report, contradicted some of the statements made in the
Function Report, such as the claim that he was only able to walk a
couple of blocks before needing rest and the claim that he was in
constant pain day and night. Tr. 26. The ALJ's credibility findings
are supported by substantial evidence in the record.

There is no evidence that the VA has found Mr. Thebo 100%
disabled. There are passing references to disability ratings of
30% and 40% for a respiratory condition in Mr. Thebo's medical
chart notes, but the only document that evidences a formal
disability finding is, as Mr. Thebo concedes, that of February
1997, finding Mr. Thebo 10% disabled by tinnitus and 10% disabled
by his respiratory condition.

With respect to Mr. Thebo's emotional state and traumatic
events, the ALJ found his statements not credible on the basis of
the findings of Doctors Phan, de Young and Golec, discussed above.
I find no error here.

3.    ALJ's rejection of Dr. Hall's diagnosis

The ALJ must resolve conflicts in the medical evidence.
Carmickle, 533 F.3d at 1164. Dr. Hall's opinion that Mr. Thebo had

OPINION AND ORDER Page 25

PTSD conflicted with the findings of two psychiatrists and a psychologist who examined Mr. Thebo twice. Dr. Hall's opinion appears to be based on a single meeting with Mr. Thebo and Mr. Thebo's descriptions of symptoms. Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with inconsistency between a claimant's subjective complaints and his diagnosed conditions. Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005). The doubts cast on Mr. Thebo's credibility make the foundation of Dr. Hall's opinion faulty. Moreover, Dr. Hall's opinion is directly contradicted by those of Doctors Phan, deYoung, and Golec. The ALJ's rejection of Dr. Hall's opinion was not erroneous.

    4.   Lay testimony

    Mr. Thebo asserts that the ALJ should have given more weight to an undated letter[8] in which Mrs. Thebo described Mr. Thebo's exposure to C-4 charges during the "Blast Over Pressure" incident; his symptoms through "the duration of the testing;" his exposure to a contaminant leaking from a Scud missile; and her observations of Mr. Thebo's symptoms during and after his military service. I find no error in the ALJ's refusal to credit inadmissible hearsay statements based on what Mr. Thebo told his wife, but Mrs. Thebo's observations of Mr. Thebo's symptoms cannot be disregarded without comment. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).

    Mr. Thebo also asserts that the ALJ should have given more

---

[8] The text of the letter indicates that it was written in the fall of 2000. Tr. 128.

OPINION AND ORDER Page 26

weight to an undated and unsigned letter from Julie Thebo, Mr. Thebo's mother. This letter contains inadmissible hearsay about what her son's doctors told her, but also contains statements about her observation of Mr. Thebo's coughing, swollen joints and fatigue. Lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account, Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993), unless he expressly decides to disregard such testimony, in which case "he must give reasons that are germane to each witness." Id. The ALJ stated only that he had "considered" the statements from Mr. Thebo's wife and mother, but did not give specific reasons germane to each of them for disregarding them. This was error.

When an ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that the error was inconsequential to the ultimate non-disability decision--that is, no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination. Stout v. Commissioner, 454 F.3d 1050, 1055-56 (9th Cir. 2006).

Mr. Thebo's wife wrote that as of the fall of 2000, Mr. Thebo was constantly short of breath, nauseous, weak, unable to keep down food, in constant pain from his swollen joints, throwing up blood, and having blood in his urine. Tr. 128. She stated that her husband stayed at home and took care of their children, but his shortness of breath and low energy made watching the children "often too much

OPINION AND ORDER Page 27

to handle." Id. She wrote that Mr. Thebo had blackouts when he coughed too hard and afterwards was difficult to awaken and unable to get out of bed for hours. Id.

Mr. Thebo's mother wrote that Mr. Thebo was in constant pain, had swollen joints, perspired profusely and turned gray while attempting to do a task as simple as eating a meal, tired easily, coughed constantly, which created "great pain at the base of the skull," and "often coughs up blood." Tr. 122.

It is axiomatic that the claimant must establish the existence of a *medically determinable* physical or mental impairment that prevents him from engaging in any substantial gainful activity. Consequently, the ALJ's improper rejection of the testimony of Mr. Thebo's wife and mother can only be inconsequential to the ALJ's non-disability decision if there is no evidence of a medically determinable cause for the symptoms they observed, or if their testimony is based on statements made to them by Mr. Thebo, whose credibility has been questioned.

The two women described the following symptoms: shortness of breath; weakness; nausea; inability to keep down food; constant pain; swollen joints; vomiting blood; blood in the urine; coughing up blood; blackouts followed by stupor; perspiration and pallor at the simplest task, such as eating; and pain in the back of the skull caused by coughing.

The medical evidence establishes that Mr. Thebo has a bronchial condition, but the condition is described as "reversible," see, e.g., tr. 438, and  controlled with albuterol

OPINION AND ORDER Page 28

and guaifenesin (although Mr. Thebo reported that he had stopped taking Azmacort and albuterol because they gave him a sore throat. Tr. 549.) There is no medical evidence of heart disease, which could account for severe shortness of breath: chest x-rays have been consistently normal, a CT scan of the chest was unremarkable, and an echocardiogram was normal. In February 2000, examining physician Joseph Sanchez wrote that he had observed no hemoptysis and that he doubted Mr. Thebo's report of massive hemoptysis. With respect to the blackouts followed by stupor, a complete neurological workup revealed no evidence of seizures, with all neurological tests within normal limits. The two women's testimony that Mr. Thebo had shortness of breath, hemoptysis, blackouts, and headaches caused by coughing is necessarily based, at least in part, on the dubious credibility of Mr. Thebo.

There is no clinical evidence of a condition that could cause general weakness. Physical examinations showed normal muscle tone and strength and normal enervation, except for suggestions of malingering such as breakaway muscle weakness and an inconsistent sensory examination. See, e.g., tr. 401, 409, 416. Dr. Mante's neurological examination revealed normal cranial nerves, no weakness, atrophy or abnormal muscle tone of the motor system, brisk reflexes, normal sensory examination, no signs of ataxia, and normal gait. Dr. Casey's neurology examination yielded similar results. Bone scans and x-rays indicated only mild or minimal degenerative disc or joint disease.

Chart notes indicated no findings of swollen joints or obvious

OPINION AND ORDER Page 29

arthritis upon physical examination. See, e.g., tr. 427, 433. On April 6, 2000, Robert Paine, M.D., indicated that he thought a rheumatoid condition unlikely based on lab results. Tr. 427.

Neurological workups and MRIs of the brain and cervical spine done in response to Mr. Thebo's complaints of headache were normal.

There is no evidence of a condition that could cause nausea and an inability to keep food down. A gastric emptying scan showed no evidence of gastroesophageal reflux. Numerous chart notes refer to Mr. Thebo's obesity. See, e.g., tr. 420, 437, 786, 799 (chart note dated May 19, 2006: "likes to eat and is overweight but has lost weight with Atkins diet"). At an interview on March 6, 2002, Mr. Thebo stated that he ate five or more servings of fruits or vegetables every day and six or more servings of grain products every day; he also stated that he had not had any unintentional weight loss in the past three months. Tr. 533. Urinanalyses were within normal limits. See, e.g., tr. 548, 557, 617-18.

Mr. Thebo's skin rash was diagnosed as folliculitis, and a biopsy requested by Mr. Thebo confirmed the diagnosis. Tr. 622-23.

In summary, Mr. Thebo's medical evidence does not contain objective findings of a condition that would account for the symptoms reported by Mr. Thebo's wife and mother, to the extent that testimony is not based on Mr. Thebo's statements to them. Accordingly, I conclude that even if their testimony were credited, no reasonable ALJ could conclude on the basis of the entire record that Mr. Thebo was disabled. The ALJ's failure to provide reasons for rejecting this evidence was harmless error.

OPINION AND ORDER Page 30

5.    <u>Hypothetical to VE</u>

Mr. Thebo asserts that the ALJ erred by not including in the hypothetical to the VE additional limitations proposed by his attorney, including inability to perform simple routine tasks, and being required to miss more than two days of work per month. This argument is unpersuasive.

Although the ALJ must propose a hypothetical to a VE that is based on medical assumptions supported by substantial evidence in the record that reflects each of the claimant's limitations, see, e.g., <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163 (9th Cir. 2001), the ALJ is free to reject restrictions in a hypothetical question that are not supported by substantial evidence. <u>Id.</u> at 1165. If the claimant fails to present evidence that he suffers from certain limitations, the ALJ need not include those alleged impairments in the hypothetical question to the VE. <u>Id.</u> at 1164.

There is no evidence in the record that Mr. Thebo is so cognitively impaired that he is unable to do even simple, routine tasks. As the ALJ noted, Mr. Thebo's self report of May 2005, in which he said he was able to care for his children, prepare meals, grocery shop, and attend church and the children's school, and his statement to Dr. Thompson that he intended to do internet research on a medication, strongly suggest otherwise. Nor is there any medical evidence of a condition that would require Mr. Thebo to be absent from work more than two days a month. I therefore find no error in the ALJ's decision not to include the limitations proposed by Mr. Thebo's attorney in the hypothetical to the VE.

OPINION AND ORDER Page 31

The decision of the Commissioner is affirmed.

IT IS SO ORDERED.

Dated this 2nd day of <u>December</u>, 2009.

<u>    /s/ Dennis James Hubel    </u>

Dennis James Hubel
United States Magistrate Judge

OPINION AND ORDER Page 32